## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

CHARLES HALL,            )
    Petitioner,        )
               )
v.                       )         No. 2:15-cv-02273-TLP-tmp
               )
MIKE PARRIS,             )
    Respondent.        )

---

## ORDER DENYING PETITION,
## ORDER DENYING CERTIFICATE OF APPEALABILITY,
## ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH, AND
## ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

---

Petitioner Charles Hall[1] petitions this Court for habeas corpus relief under 28 U.S.C. § 2254.  (Petition ("Pet."), ECF No. 1.)  Respondent answered and filed the state court record. (Answer, ECF No. 15, Record ("R."), ECF No. 14.)  Hall replied to Respondent's answer. (Reply, ECF No. 19.)

As discussed more fully below, the issues Petitioner raises in the habeas petition fall into one category, whether the state court identified and applied the correct federal legal principles. For the reasons discussed below, the petition is DENIED.

## BACKGROUND

I.      **Petitioner's State Court Conviction**

A Shelby County grand jury returned an indictment against Petitioner Hall on January 8, 2004, charging him with two counts of aggravated robbery.  (R., Indictment, ECF No. 14-16 at

---

[1] Petitioner, Tennessee Department of Correction ("TDOC") prisoner number 127083, is confined at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee.

PageID 803.)  Hall was convicted of both counts as charged on May 22, 2009.  (R., Minutes ("Mins."), ECF No. 14-16 at Page ID 882.)  The trial court sentenced Hall to life without parole after determining that he was a repeat violent offender.[2]  (R., Judgment ("J."), ECF No. 14-16 at PageID 888-89.)  Hall appealed his conviction and sentence.  (R., Notice of Appeal, ECF No. 14-16 at PageID 904.)  The TCCA affirmed.  *State v. Hall*, No. W2009-02569-CCA-R3-CD, 2010 WL 5271082 (Tenn. Crim. App. Dec. 10, 2010), *perm. app. denied* (Tenn. Apr. 12, 2011).

## II.     Petitioner's State Court Post-Conviction Petition

Hall filed a pro se petition in Shelby County Criminal Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to 40-30-122.  (R., Pet. for Post-Conviction Relief, ECF No. 14-29 at PageID 2204-15.)  On October 23, 2012, appointed counsel filed an amended petition.[3]  (R., Am. Pet., ECF No. 14-29 at PageID 2218-19.)  The post-conviction court conducted an evidentiary hearing and denied relief in an order entered on May 31, 2013.  (R., Order, ECF No. 14-29 at PageID 2221-30*.*)  Hall appealed this denial.  (R., Notice of Appeal, ECF No. 14-29 at PageID 2233.)  The Tennessee Court of Criminal Appeals ("TCCA") affirmed the post-conviction court's ruling.  *Hall v. State*, No. W2013-01438-CCA-R3-PC, 2014 WL 5502424 (Tenn. Crim. App. Oct. 31, 2014).

On direct appeal, the TCCA summarized the procedural history of the case and the evidence presented at trial:

> This case arises out of the February 2003 robbery of Sherron Jefferson, the victim, an employee of the Wonder Bread store on South Third Street in Memphis.  As a result, the defendant was indicted on two counts of alternate theories of aggravated robbery.  The indictment was consolidated with another indictment, case number 04–00119, for trial; however, on August 11, 2006, this

---

[2] The trial court merged the second count of aggravated robbery into the first count.
[3] The petition filed by counsel is styled as a second amended petition.  However, the record does not contain an amended petition.  (R., ECF No. 14-29.)

2

court reversed the defendant's convictions in the two cases and remanded for separate trials as to each indictment. *See State v. Charles Hall*, No. W2005–01338–CCA–R3–CD, 2006 WL 2334850, at *1, *7 (Tenn. Crim. App. Aug.11, 2006), *perm. to appeal denied* (Tenn. Dec. 18, 2006).

## State's Proof

The victim testified that she was working at the Wonder Bread store on Sunday, February 23, 2003. As she was stocking shelves in the back room in preparation of closing, the victim noticed that a man, identified as the defendant, had entered the store through the front door. As the defendant entered, a young boy also entered the store, yelling to the victim that she had a customer. The victim called to the front that she would help him shortly, but the defendant walked from the front and into the office that bisected the store. The defendant brandished a "[l]ittle silver gun" in his right hand and told her to cooperate. Upon seeing the gun, the victim was frightened, afraid that the defendant was going to kill her.

The defendant told the victim to go to the front of the store, display the "closed" sign, and lock the door. When the victim complied with the defendant's demand, she noticed that the young boy, who appeared to be nine years old, was still in the store. She explained that it was normal for the neighborhood children to hang around the store and help with tasks in exchange "for a cake or something." The defendant held the boy's hand in his left hand and the gun in his right hand as he told the victim to go to the cash register and not sound any alarms. The defendant told her to remove only the cash from the register and put it in a plastic bag. The victim did as she was instructed, placing approximately $100 in a store bag. The victim handed the money to the defendant "[b]ecause he had a gun, and [she] was afraid."

The victim testified that the defendant then asked for the videotape from the store's surveillance camera. When the victim tried unsuccessfully to eject the tape from the VCR, the defendant became agitated. The victim attempted to remove the VCR from the wall, and the defendant "snatched it and stepped on it, and that's the only way we got the tape out of it." The defendant had the victim show him a door in the stock room he could use as an exit and then placed the victim and young boy in the bathroom with instructions not to come out for fifteen minutes. The defendant threatened to hurt them if they came out of the bathroom before he left.

The victim testified that after fifteen to twenty minutes, they exited the bathroom, and she called the nearby fire station. By the time the fire department personnel arrived, the young boy had left the store. Police officers arrived in less than ten minutes after the fire department personnel, and she told them what had happened. However, she did not mention anything about the young boy being

present because "[t]hey never asked [her] was anybody in the store. They just asked [her] about the robbery." The victim admitted that she later gave a statement to Sergeant Bell in which she again did not mention the young boy. She explained that she did not mention him because

> he was upset about [the robbery]. And I was upset. And I didn't want to put him through what I had to go through because his mom—during that time, his mom had said he was already having problems, so I didn't want to take him through it, so I never mentioned him.

She elaborated that she spoke with the boy's mother about the incident because he had told his mother about what had happened. The victim said that the first time she mentioned the presence of the young boy was when she was asked a question by the defendant's attorney at another court proceeding.

The victim testified that she gave a brief description to the police that the defendant was tall and light-skinned. At trial, she recalled that the defendant was wearing blue jeans, a yellow-orange "bubble" jacket pulled up over the bottom of his face, a "skull hat," and rubber surgical gloves. She estimated that the entire ordeal, including the time they waited in the bathroom, lasted thirty minutes. She was within one to two feet of the defendant the entire time, and nothing impaired her view. The victim explained that she had been instructed by her employer that in the event of a robbery, to look at the perpetrator's eyes in hopes of later making an identification. The victim said that she looked at the defendant's face but focused on his eyes as a way of letting him know that she was going to cooperate.

The victim testified that she viewed a photographic array on March 13, 2003, from which she identified the defendant as the robber because "[she] recognized him through his eyes." She said that she also recognized the defendant's forehead, nose, cheeks, and mustache area. She recalled that the defendant's photograph "jumped out" at her, so she took a piece of paper to cover part of his forehead and mouth "to make sure [she] was picking the right guy." The victim said that in addition to the photographic array, she also identified the defendant at a preliminary hearing, at a motion hearing, and at another court proceeding.

On cross-examination, the victim admitted that it was untruthful for her to have previously testified that the first time she spoke with anyone about the young boy being present was when defense counsel asked her at a prior proceeding when she had actually spoken with the boy's mother. She also admitted that it was untruthful for her to have not mentioned the boy when asked to give a detailed description of the incident. The victim said that she never told Sergeant Bell prior to viewing the photographic array that the robber's eyes were the feature by which she would be able to identify him. When shown the photographic array,

the victim admitted that she would not have picked two of the individuals because their eyes were closed but said that she still looked at their photographs. The victim acknowledged, in looking at a photograph of the defendant, that the defendant had a scar in his left eye, but she did not include a scar in her description.

On redirect examination, the victim testified that she did not select the individuals in the array who had their eye or eyes closed because neither of them was the individual who robbed her.

Boris Owens testified that he and his mother were outside the Wonder Bread store on February 23, 2003, when they saw a light-skinned, African–American man who was approximately 6'1" exit out the seldom-used side door of the store. They went to the front door of the store and it was locked. They looked inside and saw that the cash register was lying on the counter. Owens never saw a young boy or a woman come out of the store.

The prior sworn testimony of Officer Sherman Bonds was read into evidence. In that testimony, Officer Bonds stated that he worked in the Memphis Police Department's Crime Scene Unit. On February 23, 2003, Officer Bonds was called to the scene at the Wonder Bread store on South Third Street. Officer Bonds dusted a VCR for prints but was unable to obtain any.

Lieutenant William Woodard with the Memphis Police Department testified that he was involved in the investigation of the Wonder Bread store robbery. Lieutenant Woodard made a follow-up call to the victim the day after the robbery to obtain any additional details. The victim never mentioned a young boy being present, nor did he ask if a young boy was there. Lieutenant Woodard typed a synopsis for the case file and waited for more information to come in. At some point, the officer received a Crime Stoppers tip identifying the Wonder Bread store and the defendant by name and giving a few details about the defendant. Lieutenant Woodard obtained an old booking photograph of the defendant based on the information gathered from the tip. Approximately five days later, Lieutenant Woodard received a call inquiring about the status of the prior Crime Stoppers tip and providing the same, plus some additional, information. Lieutenant Woodard did not take a formal, written statement from the victim, and he explained that it was not uncommon to wait for an arrest to be imminent before obtaining a written statement. The case was transferred to Sergeant J.B. Bell of the Memphis Police Department.

On cross-examination, Lieutenant Woodard acknowledged that the victim told him during their conversation the day after the robbery that she did not think she could identify the robber and such was noted in the report supplement. He also acknowledged that he was able to create a photographic array based on

information received from the Crime Stoppers tip, not from any information given by the victim.

Sergeant J.B. Bell, Jr. testified that he was transferred to the Wonder Bread store robbery case after the Crime Stoppers tip came in because he was working on a similar case. Upon receiving the case, Sergeant Bell contacted the victim who gave him a general description of the robber, including the robber's hair and eyes and that he had "a little mustache" and was light-complected. Based on the information given by the victim, along with the information from the Crime Stoppers tip, Sergeant Bell assembled a photographic array depicting the defendant and five other individuals similar to the defendant and matching the victim's general description. He first attempted to assemble the array with the help of a computer system. However, the computer kept suggesting "real old men" and men with "gray hair and afros," so Sergeant Bell had to create the array manually to ensure that the defendant did not stand out in the array.

Sergeant Bell testified that he had the victim read and sign an advice form prior to viewing the array on March 13, 2003, and the victim appeared to understand the instructions. The victim looked at all the individuals and used paper to cover up their faces even though she "seemed kind of startled," as if she recognized someone, upon initially seeing the array. The victim pointed out the defendant and said that she was absolutely sure of her identification. The victim gave a formal statement within a day or two of making the identification.

Sergeant Bell testified that the victim never told him about a young boy being present during the robbery, and he never asked her if one was present. The victim never affirmatively told him that she was alone. Sometime after the victim made the identification, Sergeant Bell spoke with the defendant at the robbery office and noticed nothing unusual about the defendant's appearance. At an earlier court proceeding, Sergeant Bell was asked to look at the defendant from a distance of two to three feet, during which time he eventually noticed that one of the defendant's eyes was smaller than the other. He was also able to see, after the defendant pointed it out, that the defendant had a small scar on his eye.

On cross-examination, Sergeant Bell recalled that the victim mentioned the defendant's eyes when she selected him from the array, but she had never given a description of the robber's eyes. Asked why he included photographs of two individuals in the array in which the view of the individuals' eyes was impeded, Sergeant Bell explained that they had similar features to the defendant and he "didn't have information about the [importance of the] eyes when [he] [created the array]." Sergeant Bell clarified that the victim made the identification and then began mentioning the robber's eyes. Sergeant Bell admitted that in the statement given by the victim the day after the photographic identification, she did not mention anything about the robber's eyes or mustache in her description.

On redirect examination, Sergeant Bell stated that he would not have changed the course of his investigation in any way had he known that a young boy was present except that he probably would have charged the defendant with an additional offense.

**Defendant's Proof**

Georgia Johnson, the defendant's first cousin, testified that the defendant had a noticeable dark spot in one of his eyes since childhood. She said that the defendant would have been in his early to mid-fifties in 2003.

Robert Lively, owner of Courtesy Consultants, a security company, employed the defendant as a security guard for an apartment complex in 2003. Lively never received any complaints from the apartment complex about the defendant not showing up for work, and Lively characterized the defendant as a good employee. He recalled that the defendant filled out a time sheet that indicated he was working from 1:00 to 9:00 p.m. on February 23, 2003. However, Lively could neither confirm nor deny that the defendant actually worked the hours he claimed to have worked on the day of the robbery. Lively acknowledged that regarding one of the other days reported on the time sheet, the defendant was docked three hours from what he reported due to his not responding when the base radioed him. Lively acknowledged that he never got the radio belonging to Courtesy Consultants back from the defendant after his employment ceased. If he were informed that the defendant had pawned the radio on twenty occasions, he would not have considered him a good employee. Lively said that in the approximately nine months that the defendant worked for him, the defendant asked for an advance on his paycheck on more than one occasion.

After the conclusion of the proof, the jury convicted the defendant as charged of two counts of aggravated robbery.

*State v. Hall*, 2010 WL 5271082, at *1–*5.

The Tennessee Court of Criminal Appeals' opinion on post-conviction appeal

summarized the evidence presented at the post-conviction hearing:

It is somewhat difficult to follow the petitioner's evidentiary hearing testimony because several of the issues appear to be closely related and he moves back and forth among his various complaints. Additionally, his testimony is peppered with citations to various legal opinions and arguments. His first issue, as we understand, was that the victim had been shown two photospreads, and one was an "illegal, contaminated duplicate photospread," which, in his view, trial counsel should have sought to suppress by filing an appropriate motion. He

contended that the first was suggestive in the manner in which his photograph was presented and the victim picked his photograph in the second spread only after she had been shown the first suggestive spread. Related to this complaint is the petitioner's claim that counsel should have pursued a motion to suppress the identification by the victim.

The petitioner testified that his "second issue" was that trial counsel did not object "when [the] prosecutor elicited testimony from Sergeant J.B. Bell about a bank robbery. Counsel failed to file a motion to suppress the Crime Stopper[s] tip that contained prejudicial hearsay statements." As to this claim, trial counsel testified that he did not object to this testimony because his defense was based partly on an inadequate investigation by the police of the robbery for which the petitioner was being tried.

Further, the petitioner complained that counsel failed to seek hearings on twenty-two pretrial motions which were filed. Among these motions was one for the State to identify all persons at the crime scene. The petitioner said that a young boy was present and speculated that this particular witness "could have been brought to court and possibly exonerated [the petitioner] from being, you know, not being the one that committed the crime."

The petitioner argued that counsel was ineffective for failing to object to "old booking photos" of the petitioner, thus "[i]nferring to the jury that [he] had been arrested before."

Trial counsel testified that he had been an attorney for thirteen years, practicing both civil and criminal law, and had participated in approximately fifty jury trials. He said that he met with the petitioner during the times he was brought to court. The petitioner called trial counsel "quite a bit" at both his office and on his cell phone. He described the petitioner as a "jailhouse lawyer":

> And what I mean by that is [the petitioner] is, I don't know if this is the proper term, but at times can act very much as if he's some kind of jailhouse lawyer and he was constantly sending me things to review and case law to read. And I would spend a lot of the time . . . having to explain to [the petitioner] that those issues were really not relevant to his case. And that my job was essentially to attack . . . the State's case and put on the best trial possible.

> And as far as the strategy, [the petitioner] was constantly kind of straying from what I thought was the road map which we were going to follow and that was going to essentially attack the credibility of the eyewitness, Sharron Jefferson. And one of the what I though[t] was going to be a bonus, which actually maybe

turned into a little bit more of a problem, was that this case had already been tried once. . . .

And so a lot of the things that [the petitioner] was trying to focus on I kept telling him those are really appellate issues, it didn't have anything to really do with challenging the evidence and preparing a good opening and cross-examination of the State's witnesses. But if I had to summarize and say what was our defense, what was our tactic, it was to challenge the mistakes, the errors that were going to come out in the proof. And to be honest, we were very successful at that.

Trial counsel said the petitioner was never in "full agreement" with what he was doing, and they spent a "considerable time" in "debates." During the trial, the petitioner "was constantly tapping [counsel] on the shoulder, handing [him] things, telling [him] to jump up." Counsel said that "for three years" he spent the "majority" of his afternoons "researching, kind of essentially responding to [the petitioner's] letters." Although the petitioner gave counsel the impression that he wanted to testify during the trial, he did not provide a list of "alibi witnesses or anything like that." They discussed the impact of the petitioner's prior criminal record. During the trial, the petitioner told counsel that he was "just trying to get the judge tripped up so we'll have something for appeal."

As for the petitioner's claims about the photospread, counsel said he did not remember seeing one with the numbers missing, as the petitioner had presented during his evidentiary hearing testimony. Rather, the copy of the photospread in counsel's file bore a notation that the petitioner had been identified by the victim. As for a motion to suppress the identification, counsel said that such a motion was unsuccessful in the first trial, and the petitioner then wanted to raise objections about "either typos or graphical or procedural things, not the actual substance of the lineup." However, at the second trial, there were "no additional reasons" to seek suppression of the victim's identification.

Regarding the "twenty-two some odd motions" the petitioner complained that counsel had not pressed, counsel said he had a "good rapport" with the State and open-file discovery had been made. He explained that the petitioner had a "considerable amount" of robbery convictions, some in other states, and it was the petitioner's decision not to testify. He said that it had been trial strategy to allow testimony regarding the Crime Stoppers tip:

And . . . I made the decision that based on the testimony of the officers who agreed with me that there were errors to the Crime Stopper[s] tip, dates were left off, things like that. And so we made the decision to allow it to be entered so that it would go along with the theme of look at all these errors. Look at all these.

> How can this stuff be reliable if they don't even—if they have dates that I believe the date on the sheet of paper was a date that wasn't even in time, so it was an impossibility.
>
> Counsel concluded by saying that the petitioner was complaining about matters that would not have resulted in a different verdict.
>
> At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently entered a written order denying relief.

*Hall v. State*, 2014 WL 5502424, at \*5–\*7.

## LEGAL STANDARDS

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

## I.   Exhaustion and Procedural Default

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. 28 U.S.C. § 2254(b)–(c); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[4] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state

---

[4] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999).  Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

The procedural default doctrine is ancillary to the exhaustion requirement.  *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review.  *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted)).[5]  In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

---

[5] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 54.) (internal quotation marks and citations omitted).

If a petitioner's claim has been procedurally defaulted at the state level, the petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or that a failure to review the claim would result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## II.     Merits Review

Pursuant to Section 2254(d), where a claim has been adjudicated in state courts on the merits, a habeas petition should only be granted if the resolution of the claim:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 182. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of

materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13. The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at 409. The writ may not issue merely because the habeas court, "in its independent judgment," determines that the "state court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is minimal case law addressing whether, under § 2254(d)(2), a decision was based on "an unreasonable determination of the facts." In *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.[6] In *Rice v. Collins*, 546 U.S. 333 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice*, 546 U.S. at 341–42.

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and has emphasized that, pursuant to § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary.

---

[6] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court found it unnecessary to reach that issue, and left it open "for another day". *Id.* at 300–01, 303 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006) (recognizing that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable)).

*Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011).

## III.    Ineffective Assistance

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed on this claim, a movant must demonstrate two elements: 1) that counsel's performance was deficient, and 2) "that the deficient performance prejudiced the defense." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[7] "A reasonable probability is a probability sufficient to undermine confidence in the

_____

[7] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

outcome. *Id.* at 694. It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Strickland*,] at 693. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.*, at 687." *Harrington*, 562 U.S. at 104 (citing *Strickland*); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail. "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The deference accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when reviewing an ineffective assistance claim:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

A criminal defendant is entitled to the effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The failure to raise a nonfrivolous issue on appeal does not constitute per se ineffective assistance of counsel, as "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks and citation omitted). Claims of ineffective assistance of appellate counsel are evaluated using the *Strickland* standards. *Smith v. Robbins*,

528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered

ineffective assistance by failing to file a merits brief); *Smith v. Murray*, 477 U.S. at 535–36

(failure to raise issue on appeal). To establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal - that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Smith v. Robbins*, 528 U.S. 259, 285 (citation omitted).[8]

An appellate counsel's ability to choose those arguments that are more likely to succeed

is "the hallmark of effective appellate advocacy." *Matthews v. Parker*, 651 F.3d 489, 523 (6th

Cir. 2011) (quoting *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003)). It is difficult to show

that appellate counsel was deficient for raising one issue, rather than another, on appeal. *See id.*

"In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger

than issues that counsel did present." *Id.* Defendant must show that "there is a reasonable

---

[8] The Sixth Circuit has identified a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1. Were the omitted issues "significant and obvious?"
2. Was there arguably contrary authority on the omitted issues?
3. Were the omitted issues clearly stronger than those presented?
4. Were the omitted issues objected to at trial?
5. Were the trial court's rulings subject to deference on appeal?
6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?
8. Did the petitioner and appellate counsel meet and go over possible issues?
9. Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted). Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted). Where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.

In 2012, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012), which recognized a narrow exception to the rule in *Coleman*, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Martinez*, 566 U.S. at 17. In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* The requirements that must be satisfied to excuse a procedural default under *Martinez* are:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original).

*Martinez* considered an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal. *Martinez*, 566 U.S. at 4. In the Supreme Court's subsequent decision in *Trevino*, 569 U.S. at 429, the Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default. *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

## ANALYSIS

In the § 2254 petition, Hall raises the following issues:

1.  The trial court erred by failing to hold an evidentiary hearing on Hall's motion to suppress the witness' identification (Pet., ECF No. 1 at PageID 5);

2.  The evidence was not sufficient to convict Petitioner of aggravated robbery (*id.*, ECF No. 1 at PageID 7);

3.  Trial counsel performed deficiently by

    a.  introducing the Crime Stoppers tip in evidence, rather than suppressing it, by failing to object to Sergeant Bell's testimony about the tip, by failing to suppress the witness' identification, and by failing to cite to authorities which

supported these issues on appeal[9] (*id.*, ECF No. 1-1 at
PageID 29);

   b.    failing to follow through on certain pre-trial motions (*id.*);
         and

   c.    failing to suppress Hall's prior convictions.  (*Id.*)

Issues 1 and 2 were presented to the TCCA on direct appeal.  (R., Brief ("Br." of

Appellant, ECF No. 14-25 at PageID 2097.)  Issues 3(a)-(c) were presented to the TCCA during

the post-conviction appeal.  (R., Br. of the Appellant, ECF No. 14-32 at PageID 2338.)

**I.    Did the trial court err by failing to hold an evidentiary hearing on Hall's
       motion to suppress the witness' identification?  (Pet., ECF No. 1 at PageID
       5.)**

Hall alleges that he was identified by use of a suggestive, prejudicial, and unfair

photographic array and that the trial court erred by failing to hold an evidentiary hearing on his

motion to suppress the photographic identification.  (*Id.*)  Hall contends that the decision of the

TCCA is contrary to *Neil v. Biggers*, 409 U.S. 188 (1972).  (*Id.*)  Respondent argues that the

decision of the TCCA is consistent with controlling Supreme Court law.  (Answer, ECF No. 15

at PageID 2436.)

After reviewing the evidence presented at trial, the TCCA opined:

        The defendant argues that the photographic array from which the victim
        made a pretrial identification was overly suggestive and that the trial court erred
        in failing to hold an evidentiary hearing or rule on his motion to suppress the
        identification prior to trial.

        Defense counsel, who was a different attorney than the defendant's
        attorney at the first trial, filed over twenty motions prior to the second trial.  It

_____

[9] Respondent's Answer addresses Issue 3(a) as five separate issues of ineffective assistance and
contends that two of the five are barred by procedural default.  (Answer, ECF No. 15 at PageID
2349, 2449-51.)  Petitioner Hall's Reply contends that the issues were presented as one issue to
the Tennessee Court of Criminal Appeals, were addressed, and are exhausted.  (Reply, ECF No.
19 at PageID 2472–77.)  The Court will address the topics as one issue.

appears that the State did not respond to, pertinently, the defendant's motion to suppress, nor did the court explicitly rule on the motion. However, discussion at the motion for new trial indicates that the defendant had a conversation with the trial court at some point in which it was discussed that "some motions had been filed but that they had already been ruled on . . . and the court decided just to go ahead and proceed based on . . . the issue of suppression had already been ruled on." The State further indicated at the motion for new trial hearing that, because the case was reversed only on the consolidation issue, it did not go through the redundancy of dispensing of the pretrial motions a second time. From our opinion on direct appeal following the first trial, we glean that a hearing on a motion to suppress was held and that the motion was apparently denied as the photographic identification was mentioned at that trial.

The defendant provided no authority in support of his assertion that the trial court erred in apparently relying on the original trial court's ruling and not holding an evidentiary hearing on the suppression motion. In any event, the crux of the defendant's complaint is that the pretrial photographic identification was so impermissibly suggestive that the victim's identification was unreliable, which we will address.

In *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Our supreme court has adopted the same standard to be applied by our courts for assessing whether a pretrial identification has violated the due process rights of the defendant, thereby tainting any in-court identification made by the witness. *See Bennett v. State*, 530 S.W.2d 511, 512–15 (Tenn. 1975). Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. *Biggers*, 409 U.S. at 199. The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Simmons v. United States*, 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).

If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199 (internal quotations omitted). The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* If, however, the court first determines that the identification procedure itself was neither unnecessarily

or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification, there is no need to apply the totality of the circumstances test outlined in *Biggers*. *See State v. Leon J. Robins and Tabatha R. White*, No. M2001–01862–CCA–R3–CD, 2003 WL 1386835, at *9 (Tenn. Crim. App. Mar.20, 2003) (citing *State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990)), *perm. to appeal denied* (Tenn. Oct. 13, 2003).

Upon review of the photographs in the array, we cannot conclude that the defendant's photograph was "grossly dissimilar" to the others. *State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing *United States v. Wade*, 388 U.S. 218, 233, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), for the proposition that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar"). The array includes color photographs of six African–American males with short haircuts and small mustaches. No one photograph background sticks out as the backgrounds are all different—varying from pure white to blue. The defendant is correct in pointing out that not all the individuals are of the same complexion, and one of the pictured individuals has his eyes closed and another individual has one eye closed. However, our supreme court has previously ruled that the "[p]hotographs contained in a photographic array do not have to mirror the accused," *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998), and the victim had not expressed any significance of the eyes. In viewing the array, the victim was told that the robber may or may not be depicted and was advised not to select anyone unless she was positive of the identification. The defendant places much emphasis on Sergeant Bell's manually creating the array instead of using a computer-generated program, but Sergeant Bell explained that he created the array manually because the computer suggested individuals with drastically dissimilar characteristics. In sum, we cannot conclude that the photographic identification was unnecessarily suggestive.

Moreover, even if the identification procedure was suggestive, a review of the five *Biggers* factors indicates that the victim's identification of the defendant was nonetheless reliable. First, the victim was within one to two feet of the robber during the incident, in a well-lit store with nothing impairing her view. Second, it is apparent that the victim's degree of attention was high as she had been instructed by her employer that in the event of a robbery, to look at the perpetrator's eyes in hopes of later making an identification, and she said that she looked at the robber's face and focused on his eyes also as a way of letting him know that she was going to cooperate. Third, the victim's initial description of the robber as tall and light-skinned, although very general, was accurate. Fourth, the victim "seemed kind of startled," as if she recognized someone, upon initially seeing the array, and then pointed out the defendant and said that she was absolutely sure of her identification. The victim affirmed at trial that she was certain of her identification. Fifth, the victim was shown the photographic array only two and a half weeks after the robbery. Upon consideration of the *Biggers*

factors and the totality of the circumstances, we conclude that the photographic identification of the defendant was reliable.

*State v. Hall*, 2010 WL 5271082, at *5–*7.

The TCCA identified the proper federal rule and applied the *Biggers* factors to the facts of the case. *See id.*, at *6. The TCCA determined that the victim's identification was reliable because the photographic lineup was not unduly suggestive and, additionally, that all five *Biggers* factors indicated the identification was reliable. Hall repeats the argument considered and rejected by the TCCA on direct appeal. (Pet., ECF No. 1-1 at PageID 22-26; R., Br. of Appellant, ECF No. 14-25 at PageID 2120-25.) Hall has not satisfied his burden of showing that the decision was objectively unreasonable. Hall also does not provide argument or evidence that refutes the presumption of correctness accorded the state court's factual determination. A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1).

Hall presents no compelling argument that the photographic array was unduly suggestive. Based on this Court's review of the transcript of Hall's trial, including the testimony of Sherron Jefferson and Sergeant J.B. Bell (R., Trial Transcript ("Tr."), ECF Nos. 14-20, 14-21, 14-22, and 14-23), the TCCA correctly concluded the photographic lineup was not suggestive and that, even if it were, the *Biggers'* factors were satisfied. Deference to the state court decision on this issue is appropriate. Issue 1 is without merit and is DENIED.

## II.     Was the evidence sufficient to convict Petitioner of aggravated robbery?  (Pet., ECF No. 1 at PageID 7.)

Petitioner Hall contends the TCCA's determination that the evidence was sufficient to support his conviction for aggravated robbery was an unreasonable determination of the facts. (*Id.*) Specifically, Hall contends that the State failed "to prove that Petitioner was guilty of the

essential elements of the offenses beyond a reasonable doubt." (*Id.*)  Respondent replies that the TCCA applied the correct federal rule and that its decision was correct.  (Answer, ECF No. 26 at PageID 2439.)

After reviewing the evidence presented at trial, the TCCA considered Hall's argument and opined:

> The defendant challenges the sufficiency of the convicting evidence, arguing that because the victim was untruthful, her identification of him as the robber was insufficient to sustain his convictions.  In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

> All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  Our supreme court stated the rationale for this rule:

>> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

> *Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of

demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

As pertinent here, aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a), "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" *Id.* § 39-13-402(a)(1).

The defendant does not dispute that an aggravated robbery occurred; he only contends that he was misidentified as the robber. The identity of the defendant as the perpetrator of the offense is a question of fact for the jury. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. *Id.* In the light most favorable to the State, the evidence shows that the victim first identified the defendant as the robber from a photographic array within three weeks of the robbery, from which the defendant's photograph "jumped out" at her. The victim also identified the defendant at a preliminary hearing, at a motion hearing, and at another court proceeding in addition to the present trial. The victim was within one to two feet of the defendant during the incident and nothing was impairing her view. She recalled that she had been instructed by her employer that in the event of a robbery, to look at the perpetrator's eyes in hopes of later making an identification.

The defendant impugns the victim's trustworthiness as a witness because of her repeatedly failing to mention that a boy was present during the robbery when asked to give a specific account of the robbery and for saying that she had not spoken with anyone about a boy being present when she had actually spoken with the boy's mother. However, any issues concerning the credibility of the witnesses were resolved by the jury as the trier of fact. The victim explained that she did not provide the information because she was not specifically asked and because the boy's mother did not want him to get involved in the matter. The defendant rigorously cross-examined the victim—challenging her credibility before the jury. The jury apparently accepted the victim's explanation and found her identification of the defendant credible. We will not second-guess its determinations.

*State v. Hall*, 2010 WL 5271082, at *9–*10.

In *Jackson v. Virginia*, 443 U.S. at 324, the Supreme Court held that, "in a challenge to a

state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites

for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if

it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 326 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

Hall contends that the victim's identification was suspect and her testimony was not credible. (Pet., ECF No. 1-1 at PageID 27.) Under Tennessee law, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," accomplished with a deadly weapon. *See* Tenn. Code Ann. §§ 39-13-401(a), 39-13-402(a)(1). It is indisputable that an aggravated robbery occurred. Additionally, as previously discussed, the victim's identification was reliable. The jury chose to credit the testimony of the victim. Hall has not met his burden of demonstrating that the state court's resolution of this issue was objectively unreasonable.

The TCCA applied the correct legal rule and cited both *Jackson v. Virginia* and state cases applying the *Jackson* standard. *See State v. Hall*, 2010 WL 5271082, at *9. The appellate court determined "the identification testimony of the victim is sufficient, alone, to support a conviction" *id.*, at *10 (citation omitted). Based on this Court's review of the transcript of Hall's trial (R., Trial Transcript ("Tr."), ECF Nos. 14-20, 14-21, 14-22, and 14-23), the TCCA correctly concluded that the testimony and evidence were more than sufficient to permit the jury to find that Hall was guilty of aggravated robbery. Issue 2 is DENIED.

**III.** **Did trial counsel perform deficiently by introducing the Crime Stoppers tip in evidence, rather than suppressing it, by failing to object to Sergeant Bell's testimony about the tip, by failing to suppress the witness' identification, and by failing to cite to authorities supporting these issues on appeal? (Pet., ECF No. 1-1 at PageID 29.)**

Hall contends that the Crime Stoppers tip should have been suppressed because it contained evidence of another crime. (*Id.* at PageID 30.) He alleges that he wrote trial counsel and requested that counsel file a motion to suppress any reference to the Crime Stoppers tip and a motion to suppress the victim's photographic identification. (*Id.*) Hall disagrees with his lawyer's decision to request that the Crime Stoppers tip be admitted in evidence. (*Id.* at PageID 31.) Hall now contends that counsel should have objected when Sergeant Bell testified about investigating an unrelated offense. (*Id.*) Respondent replies that the TCCA's determination was not contrary to or an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts. (Response, ECF No. 15 at PageID 2443, 2445, 2448–49.)

The TCCA identified the proper standard for analyzing the claim of ineffective assistance, *Strickland*, 466 U.S. at 687. *Hall v. State*, 2014 WL 5502424, at *8. The appellate court reviewed the post-conviction trial court's determination and concluded:

A. Motion to Suppress Identification

Following the evidentiary hearing, the post-conviction court found that the trial court, before the first trial, had denied the defense motion to suppress the identification of the petitioner. At the second trial, counsel relied upon this earlier ruling but, in the direct appeal, assigned this ruling as error. On appeal, this court concluded that the photographic procedure used by the investigating officer was not unnecessarily suggestive and, even if this had been the case, the victim's identification was reliable. . . .

*Charles Hall*, 2010 WL 5271082, at *7.

We note that, at the evidentiary hearing, the petitioner did not present testimony from the victim or the officer who prepared the photospread. Thus, the complaint of the petitioner regarding the identification procedure is without merit.

In this regard, the petitioner also complains that, because his prior arrest photographs were used in the photographic show-up, the jury could infer that he had a prior arrest. As to this claim, the post-conviction court found that he had failed to show that he had been prejudiced, and the record supports this determination.

### B. Crime Stoppers Tip

The petitioner complains that trial counsel should have objected to testimony regarding a Crime Stoppers tip that he was a possible suspect in another robbery. Trial counsel testified that he made a tactical decision to introduce this evidence because it further proved mistakes and errors in the investigation of the matter for which the petitioner was being tried. The post-conviction court concluded that this "was a tactical decision which is within the realm of reason" and that prejudice had not been shown regarding it. The record supports this determination . . . .

### E. Failure to Cite Authorities on Appeal

The petitioner complains that trial counsel should have cited authorities on appeal that the trial court erred in refusing to reopen the motion to suppress. The post-conviction court found that the petitioner failed to cite any relevant authorities in this regard or to show prejudice. The record supports this determination.

*Hall v. State*, 2014 WL 5502424, at *8-*10.

Although Petitioner Hall testified at the post-conviction hearing that he wanted counsel to suppress an "illegal, contaminated, duplicate photospread," Hall failed to authenticate his exhibit and failed to establish that the victim was shown the exhibit during the identification process. (R., Post-conviction Hr'g. Tr., ECF No. 14-30 at PageID 2246-57.) Hall testified that, because counsel didn't have the Crime Stoppers tip suppressed, prejudicial hearsay statements were admitted during the testimony of Sergeant Bell. (*Id.* at PageID 2276-77.) Hall contended that counsel "inadvertently had the Crime Stopper tip entered in evidence" and the jury was able to

read that he allegedly robbed a bank.  (*Id.* at PageID 2279-81.)  Hall testified repeatedly and in conclusory fashion that counsel "was deficient and [Hall] was prejudiced by his deficiency."  (*Id.* at PageID 2296.)

Trial counsel testified that his main strategy was to attack the credibility of the victim, however, Hall "was constantly straying from . . . the road map" because he was "kind of a jailhouse lawyer."  (*Id.* at PageID 2303.)  Trial counsel testified that he did not recall seeing the photospread that Hall presented as an exhibit at the hearing.  (*Id.* at PageID 2308.)  Counsel presented a copy of the photospread from the trial and it was not the photospread Hall presented at the post-conviction hearing.  (*Id.* at PageID 2308-09.)  Counsel testified that the motion to suppress had been denied in Hall's first trial, that there was "nothing in that lineup . . . which was suggestive or prejudicial," and that there was no reason to revisit the suppression motion.  (*Id.* at PageID 2309–10.)  Counsel testified that the introduction of the Crime Stoppers tip was a deliberate strategy and not an inadvertent mistake.  (*Id.* at PageID 2312.)  Counsel testified that "there was pretty sloppy police work that . . . had been done as far as paperwork" and the officers agreed that there were errors.  (*Id.* at PageID 2312-13.)  Counsel testified that the case theme was "look at all these errors . . . [h]ow can this stuff be reliable" if the police officers don't have the dates correct.  (*Id.* at PageID 2312.)  Counsel testified that he could not "see how [that] decision impacted the ultimate outcome from the jury."  (*Id.* at PageID 2313.)

Based on this Court's review of the post-conviction testimony (R., Post-conviction Hr'g. Tr., ECF No. 14-30), as well as the transcript of trial (R., Trial Tr., ECF Nos. 14-20, 14-21, and 14-22), Hall has failed to establish that his trial counsel's strategic decisions were deficient or that he suffered any prejudice from counsel's performance.  Deference to the state court decision on this issue is appropriate.  Claim 3(a) is therefore DENIED.

**IV.** **Did trial counsel perform deficiently by failing to follow through on certain pre-trial motions?  (Pet., ECF No. 1-1 at PageID 29.)**

Hall contends that counsel performed deficiently by failing to follow up on twenty pre-trial motions "that could have clearly effected the outcome of the trial", *e.g.*, a motion for a bill of particulars, a motion to obtain the arrest history of prosecution witness Boris Owens.  (*Id.* at PageID 32.)  Respondent replies that Petitioner cannot show that the state court's rejection of this claim was unreasonable or unsupported by the record.  (Answer, ECF No. 15 at PageID 2444.)

The TCCA reviewed the determination of the post-conviction court and determined:

### C. Pretrial Motions

> The petitioner complains that trial counsel was ineffective by not seeking orders on various motions.  Counsel testified at the hearing that the State had provided open-file discovery, that most of these motions had been for discovery purposes, and that the complaints in this regard were about matters that would have made no difference in the outcome of the trial.  The post-conviction court found that the petitioner had failed to show either that any of these motions would have been granted or that he was prejudiced as a result.  The record supports this determination.

*Hall v. State*, 2014 WL 5502424, at *9.

Hall contended that counsel "owed [him] a duty to have a hearing" on the motions and "failed to perform his duty."  (R., Post-conviction Hr'g. Tr., ECF No. 12-15 at PageID 2269.) Hall testified that had trial counsel followed through with requesting a bill of particulars, the child witness would have been identified and could have "possible exonerated [him]".  (*Id.* at PageID 2271-72.)  Hall also testified that he wanted the arrest histories of state witnesses.  (*Id.* at PageID 2273-74.)

Counsel testified that he spent a considerable amount of time explaining to Hall why Hall's requests were not relevant.  (*Id.* at Page 2305.)  Counsel testified that Hall "would provide case law and things but wouldn't ever provide . . . the reason or the substance of the factual issue

as to why he wanted something done.  It was almost as if the cart was somewhat more in front of the horse." (*Id.*)  Counsel testified that the majority of motions were "discovery type motions" and the prosecution had made open-file discovery available.  (*Id.* at PageID 2310.)

Hall has failed to establish that a hearing on the pretrial motions was necessary.  Trial counsel had the record from the previous trial and open-file discovery during the second trial.  Hall's first trial revealed the presence of a child during the robbery.  Hall did not call the child as a witness during the post-conviction hearing.  The Court is left to speculate about the specific testimony the unidentified and uncalled witness might have offered.  Petitioner's conclusory allegations about the testimony of an uncalled witness are insufficient to demonstrate prejudice.  *See Adams v. Jago*, 703 F.2d 978, 981 (6th Cir. 1983).  Petitioner has failed to demonstrate deficient performance by counsel or that he suffered any prejudice from counsel's performance.  Deference to the state court decision on this issue is appropriate.  Issue 3b is DENIED.

## V.      Did trial counsel perform deficiently by failing to suppress Hall's prior convictions?  (Pet., ECF No. 1-1 at PageID 29.)

Petitioner contends that trial counsel should have had his prior convictions suppressed.  (*Id.*)  Respondent replies that Petitioner cannot show that the state court's rejection of this claim was unreasonable or unsupported by the record.  (Answer, ECF No. 15 at PageID 2448.)

The TCCA reviewed the determination of the post-conviction court and decided:

D. Rule 609 Prior Convictions

The petitioner complains that trial counsel should have sought a pretrial ruling before the second trial as to which of his prior convictions could be used for impeachment purposes.  Trial counsel testified that, in this regard, he relied upon the court's ruling before the first trial, and the post-conviction court noted that this matter was taken up during the second trial when the petitioner was being questioned as to whether he wished to testify.  The post-conviction court found that the petitioner had failed to show what his trial testimony would have been

and failed to show that he was prejudiced in this regard.  The record supports these determinations.

*Hall v. State*, 2014 WL 5502424, at *10.

Hall testified that counsel failed to request a hearing outside the presence of the jury to determine which prior convictions could be used against him.  (R., Post-conviction Hr'g. Tr., ECF No. 14-30 at PageID 2287.)  Counsel testified that, although no formal 609 hearing was held, the trial judge stated he "was not going to let a lot of the prior convictions in should Hall want to testify."  (*Id.* at PageID 2307, 2321.)  Counsel also testified that the trial judge "was going to err on the side of caution."  (*Id.* at PageID 2311.)

The record demonstrates that Hall knew which convictions would be used against him.  A separate hearing was unnecessary.  No facts are presented that demonstrate any prejudice to Hall.  Deference to the state court decision on this issue is appropriate.  Issue 3c is without merit and is DENIED.

## **APPELLATE ISSUES**

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003).  The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.  A petitioner may not take an appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.  28 U.S.C. §§ 2253(c)(2)-(3).  A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree

that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must demonstrate that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed further).

A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

In this case, there can be no question that the claims in this petition are without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability. Additionally and for the same reasons, Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal in forma pauperis is DENIED.

Nevertheless, if Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).

## CONCLUSION

Petitioner Hall's § 2254 Petition is without merit and is DENIED. Hall is further DENIED leave to proceed in forma pauperis on appeal. Judgment shall be entered for Respondent.

**SO ORDERED**, this 29th day of March, 2019.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE